IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RUFUS DAVIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 08-586-SLR |
| | ) |
| NATIONAL RAILROAD PASSENGER | ) |
| CORPORATION, | ) |
| | ) |
| Defendant. | ) |

Glenn Brown, Esquire of Real World Law, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Frank J. Conley, Esquire of The Conley Firm, Philadelphia, Pennsylvania.

Virginia A. Zrake, Esquire of Law Office of Virginia A. Zrake, LLC, Lewes, Delaware. Counsel for Defendant. Of Counsel: Darrell R. VanDeusen, Esquire and Michael Severino, Esquire of Kollman & Saucier, P.A., Timonium, Maryland.

**MEMORANDUM OPINION**

Dated: August 16, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On September 18, 2008, plaintiff Rufus Davis ("plaintiff") filed this action against defendant National Railroad Passenger Corporation ("Amtrak"). Plaintiff alleges employment discrimination based on race and disability, as well as retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("the ADA"), and the Rehabilitation Act, 29 U.S.C. § 793 et seq. ("Section 504"). (D.I. 14 at 1) Plaintiff seeks, inter alia, declaratory relief, punitive and compensatory damages, and attorney fees. (Id.) Presently before the court is Amtrak's motion for summary judgment on all claims. (D.I. 37) The court has jurisdiction pursuant to 42 U.S.C. § 2000e and 28 U.S.C. § 1331. For the reasons discussed below, the court grants in part and denies in part Amtrak's motion for summary judgment.

## II. BACKGROUND

Plaintiff is an African American man who has worked for Amtrak since January 25, 1993. (D.I. 14 at 2) Plaintiff suffers from Chronic Obstructive Pulmonary Disease ("COPD"), which is a lung disease that limits breathing. (Id.) Upon commencing his employment, plaintiff received Amtrak's Standards of Excellence[1] as well as its Policy

---

[1]The discrimination policy, contained within the Standards of Excellence, states:

Amtrak will continue to be a leader in providing equal opportunity for employees in a work environment free of discrimination and harassment. As a matter of policy, we manage this company and administer our programs without regard to race, color, religion, sex, national origin, age, disability, sexual orientation or veteran's status and in conformance with all applicable federal, state and local laws. Therefore we will not tolerate

for Handling Formal Discipline.[2]  (*Id.* at 221-33)  Plaintiff first worked as a machinist at Amtrak's facility in Chicago, Illinois, and later moved to the Wilmington, Delaware location. (D.I. 39 at A13-14; A218)  After nine months at the Wilmington location, plaintiff was promoted to the position of foreman; however, on July 30, 2004, he was displaced by a more senior employee per Amtrak's seniority policy. (*Id.* at A14, A212-19)  As a result, plaintiff bid to displace a more junior employee on the second shift at Amtrak's Bear, Delaware maintenance shop (the "Bear Car Shop"). (*Id.* at A207)  Plaintiff's transfer to the Bear Car Shop was initially blocked by Assistant Superintendent Ed Hill ("Hill") because plaintiff's wife, Pamela Davis, worked as an upholsterer at the facility, and Amtrak's nepotism policy bars employees from directly supervising family members. (*Id.* at A207, A219)  Thereafter, plaintiff contacted a union representative at the American Railway and Airway Supervisors Association ("ARASA"), and was ultimately allowed to transfer. (*Id.*)  From late 2004 until July 2006, plaintiff acted as supervisor to a group of craft employees who made up a "gang" (according to Amtrak's vernacular). (*Id.* at A20-21, A206)  During this time period, at least two other

_____

> discrimination or harassment of **any kind** by our employees toward our customer or coworkers, including but not limited to racial, ethnic, religious or sexual slurs, whether written or spoken.

(D.I. 39 at 225) (emphasis in original)

[2]The Policy for Handling Formal Discipline states, in pertinent part:

> When formal disciplinary proceedings become necessary, it is the policy of this company that discipline resulting from such proceedings be administered fairly, without discrimination or prejudice, and in compliance with the requirements of the applicable labor agreement.

(*Id.* at 229)

2

African American supervisors, Roosevelt Gill ("Gill") and Cecil Simmons, were employed at Amtrak. (*Id.* at A30-31, A207)

Beginning November 22, 2004, plaintiff's workspace and property became subject to vandalism and theft. (*Id.* at A251-54) Plaintiff's filing cabinet was broken into and some items were stolen from his work area, including: two flashlights, batteries, a walkie-talkie radio, and plaintiff's clip-on lamp. (*Id.*) Plaintiff filed a report with the Amtrak Police Department ("APD") and informed his supervisors McDowell, Joe Walters, Harvey Poole ("Poole"), and Gill but did not specifically allege that the incident involved racial discrimination. (*Id.* at A234)

On December 31, 2004, the desk which plaintiff was sharing with Carol Crisconi, a Caucasian co-worker, was broken into, along with plaintiff's filing cabinet. (*Id.* at A81-82, A257) A phone charger and battery transformer were removed and thrown in the trash, and trash cans were placed on top of the desk. (*Id.*) Plaintiff filed a report with the APD regarding this incident without specifically alleging racial discrimination. (*Id.*)

On May 9, 2005, plaintiff sent a memo to his supervisors Hill, McDowell, and Poole complaining that his responsibilities had been increased in an attempt to set him up for failure. (D.I. 40 at B6-7) The memo stated that the addition of several full time employees to plaintiff's charge would decrease his effectiveness, as he was already disadvantaged by not having an office. (*Id.*) Plaintiff suggested that the "gang" be split up and be divided among the second and third shift as a solution. (*Id.*) Plaintiff alleges that the additional employees were eventually removed from the "gang" only after plaintiff bid for a different position. (D.I. 42 at B15-16)

3

On June 17, 2005, further vandalism and theft of plaintiff's workspace occurred. (D.I. 39 at A236, A263)  His desk was broken into and several items were stolen, such as a first aid kit, an eye glass cleaning station, and a clipboard with papers underneath it. (*Id.*)  Plaintiff reported the vandalism to the APD, but did not specifically allege that he suspected any racial discrimination motivating the incident. (*Id.*)

Some time before August 2005, a vacant office which was promised to plaintiff was given to a Caucasian co-worker named Kelly Bradigan ("Bradigan") after plaintiff had cleaned the office and requested the key. (*Id.* at A144-46)  Plaintiff voiced his concern to his supervisor Jim McDowell ("McDowell") that the decision to allow Bradigan to have the office was racially motivated. (*Id.* at A146)  Unlike the second shift, there are no general foremen on the third shift; Bradigan was the sole foreman on the third shift and, therefore, required access to emergency phones and other equipment within the office. (*Id.* at A208)  Thereafter, plaintiff did not have an office until he accepted the position of seat shop foreman in July 2006. (*Id.*)

Also in or around August 2005, a falsified bid sheet was submitted in plaintiff's name. (*Id.* at A88)  The sheet contained plaintiff's forged signature on a request to apply for a new position within Amtrak. (*Id.*)  At that point, plaintiff requested from his supervisors Hill and Daniel McFadden ("McFadden") that he be moved to the "cage," an enclosed and pad-locked workspace, to prevent further mischief. (*Id.* at A103-04, A197, A208)  Initially, Hill and McFadden resisted, but eventually acquiesced. (*Id.* at A208)  On November 2, 2005, plaintiff arrived at his desk to find the "cage" lock glued shut, feces on his desk, trash piled on the roof, and broom handles sticking down into

4

the work area. (*Id.* at A237)  Plaintiff notified his supervisors Poole and McDowell

through an e-mail detailing the damages; he did not specifically allege racial

discrimination. (*Id.*)

On February 9, 2006, plaintiff reported to work to find the "cage" lock glued shut

again, as well as spray glue and "oil dry" on his desk surface. (*Id.* at A267)  On

February 10, plaintiff apprised McFadden of the incidents accruing over the past

months, and followed up by e-mailing McFadden, McDowell, Poole, and Hill on

February 12. (*Id.* at A238)  Although plaintiff expressed his fear of escalation and

impending physical violence in the e-mail, he did not specifically allege racial

discrimination. (*Id.*)

On February 13, 2006, McFadden reported the vandalism of plaintiff's

workstation to Lieutenant Walter Wahler of the APD. (*Id.* at A239)  Despite plaintiff's

failure to allege a discriminatory motivation and the absence of evidence indicating

such, McFadden asked that the police address the possibility. (*Id.* at A264-67)  Plaintiff

also filed a complaint with the APD, but did not mention the possibility of racial animus.

(*Id.* at A240-41)

On February 22, 2006, Sergeant Maureen Powers of the APD contacted

Amtrak's Dispute Resolution Office ("DRO") about potential discrimination and

harassment linked to the theft and vandalism. (*Id.* at A243)  Later that week, DRO

Case Intake Coordinator Glenda Atkinson ("Atkinson") wrote to plaintiff, instructing him

to respond if he believed the incidents were related to his race. (*Id.* at A244)  Plaintiff

did not respond to Atkinson's letter, so the DRO investigation was closed. (*Id.* at A245-

5

46) Plaintiff concedes that he does not know who committed the acts, and that there was no "calling card" left after any of the incidents of theft and vandalism to signal typical racially discriminatory motivation. (*Id.*)

On February 27, 2006, plaintiff logged on to his computer and noticed that it was attempting to access the website "blackpeoplemeet.com." (*Id.* at A108-09)  Plaintiff immediately sent an email to McFadden to notify him that someone had, unbeknownst to him, accessed an unauthorized website on his computer. (*Id.* at A150-51)  Plaintiff alleges that McFadden failed to investigate the matter. (*Id.*)

On March 9, 2006, plaintiff found a plastic bag on his desk containing a white powdery substance, which he brought to the attention of McDowell and Hill. (*Id.* at A110, A250)  The substance was tested and turned out to be gypsum, a harmless material used in drywall, but the incident prompted McFadden to distribute an interoffice memo the following week reinforcing Amtrak's policies regarding harassment and discrimination. (*Id.* at A249-50, A242)  McFadden also planned to install surveillance cameras in plaintiff's workspace; however, this became unnecessary as plaintiff accepted the position of seat shop foreman and moved his workspace. (*Id.* at A249, A115)  In June 2006, plaintiff conveyed his recognition of McFadden's efforts, expressing the "highest praise and utmost respect for the way that McFadden resolved the situation." (*Id.* at A277)

In July 2006, members of plaintiff's "gang" began to complain to Hill about plaintiff socializing with his wife and sleeping in his office. (*Id.* at A208)  Eric Ferretti ("Ferretti") and Ralph Pilgrene ("Pilgrene") took a picture on Ferretti's cell phone of

6

plaintiff sleeping at his desk on July 5, 2006, stories of which eventually spread to Hill. (*Id.* at A279, A209)  After seeing the picture and conferring with plaintiff, Hill completed a Notice of Intent to Impose Discipline, charging plaintiff with being observed "in attitude of sleep, at the foreman's desk, in the seat shop[ ] of the Bear Car Shop." (*Id.* at A278-79, A209-10, A280-81)  On July 21, 2006, plaintiff met with Hill regarding the Notice. (*Id.* at A209)  At first, plaintiff denied having been asleep, but eventually accepted the discipline negotiated by ARASA representative Robert Dube ("Dube") of sixty days suspension with thirty days held in abeyance, and temporary demotion from the position of foreman. (*Id.* at A128, A285)  This was the same punishment negotiated by Dube in a previous case based on a similar incident. (*Id.* at A163; D.I. 42 at B33)  At no point during the meeting did plaintiff inform Hill of any medications plaintiff was taking that made him drowsy. (D.I. 39 at A138)  Toward the end of the meeting, plaintiff presented a picture to Hill of Pilgrene, a Caucasian employee whom plaintiff supervised, asleep at his desk. (*Id.* at A209-10, A286)  Hill responded, "[y]ou just won't leave it alone will you[?]" (D.I. 42 at B33)  Hill did not request any documentation from plaintiff regarding potential discipline for Pilgrene, and did not discipline Pilgrene thereafter. (D.I. 39 at A210)

Because Pilgrene was not disciplined, plaintiff sent an email to the Office of Inspector General ("OIG") on July 21, 2006, complaining of uneven enforcement of the rules regarding sleeping on the job. (*Id.* at A287-99)  Plaintiff's correspondence with the OIG does not contain specific allegations of discrimination based on race or disability. (*Id.*)

On August 22, 2006, plaintiff filed charges of discrimination based on race, sex, and disability with the Equal Employment Opportunity Commission ("EEOC"). (D.I. 14) Plaintiff, however, did not check the box marked "Retaliation," nor did he allege facts in support of a retaliation charge. (D.I. 39 at A320) The EEOC charge includes allegations that Amtrak did nothing to curtail the harassment that plaintiff experienced due to his race. (*Id.* at A320-21) Further, the charge alleges that plaintiff was disciplined and demoted for sleeping on the job, while another employee was not disciplined for the same infraction. (*Id.*) Plaintiff asserted that a double standard existed inasmuch as his race and disability gave rise to disparate discipline. (*Id.*)

On August 31, 2006, plaintiff's wife was disciplined for sleeping on the floor of a train car while waiting for upholstery. (*Id.* at A210) She received five days suspension, held in abeyance for six months as punishment. (*Id.* at A303) During the time plaintiff worked at the Bear Car Shop, two other employees were found sleeping on the job and disciplined in addition to plaintiff and his wife: William Cefaloni ("Cefaloni") and Damon Butcher ("Butcher"). (*Id.* at A210-11) Cefaloni is a Caucasian mechanic who received a thirty day suspension, and Butcher is an African American electrician who received the same punishment as did plaintiff's wife. (*Id.* at A304-09) On September 6, 2006, plaintiff filed a complaint with the DRO that Hill discriminated against him by imposing harsher discipline on plaintiff than on Pilgrene. (*Id.* at A310-17)

On September 20, 2007 the EEOC found cause that Amtrak had discriminated against him. (D.I. 14 at 2) The EEOC attempted to conciliate, but Amtrak refused. (*Id.*) Accordingly, on June 19, 2008, the EEOC issued a Notice of Right to Sue. (*Id.*)

Plaintiff filed suit pro se on September 18, 2008 against Amtrak, alleging discrimination based on race and disability from as early as November 29, 2004, due to the perpetuation of a hostile work environment and disparate discipline, and retaliation against protected activity. (*Id.* at 3-6)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough

9

evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Revis v. Slocomb Indus.*, 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)).

## IV. DISCUSSION

### A. Statute of Limitations

As an initial matter, the court considers the timeliness of plaintiff's allegations in view of Title VII's 300-day statute of limitations. *See* 29 U.S.C. § 626(d)(2); 42 U.S.C. § 12117(a); *Davis v. Calgon Corp.*, 627 F.2d 674, 677 (3d Cir. 1980) (per curiam) (holding that a plaintiff in a deferral state, such as Delaware, is entitled to 300-day filing period, regardless of whether he has filed state administrative complaint within 180 days after alleged discrimination occurred). As such, plaintiff's charge filed with the EEOC on August 22, 2006 would bar claims of discrimination prior to October 26, 2005 to the extent that plaintiff's claims consisted of discrete acts. The Supreme Court in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 113 (2002), held that

10

discrete acts which occurred more than 300 days before the plaintiff filed a charge of discrimination are not actionable, even when they are related to acts alleged in timely filed charges. The Supreme Court has provided a "non-exhaustive list of discrete acts," including: "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, [and] wrongful accusation." *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) (quoting *Morgan*, 536 U.S. at 114).

With this in mind, the 300-day statute of limitations bars plaintiff's claims that: (1) Hill denied plaintiff's transfer to the Bear Car Shop in 2004; (2) Amtrak passed plaintiff over in order to provide Kelly Bradigan with an office;[3] (3) Amtrak forced plaintiff to supervise extra "gang" employees prior to May 2005; and (4) a bid slip was forged in plaintiff's name in August 2005. These incidents are discrete acts. Plaintiff's remaining claim that Amtrak failed to investigate and take remedial action is properly before the court as it alleges continuing violations, and plaintiff's claim of disparate discipline is

---

[3]Plaintiff states in his answering brief that the incident took place in February 2006, however, his deposition testimony clearly places the incident at a time before he moved to the "cage." Because he was in the "cage" by August 2005, the office deprivation incident must have occurred some time before then. Plaintiff's deposition testimony make this clear:

Q My question is, when you requested the vacant office was it when you were already in the cage or before you were assigned the cage?
A Before I got the cage.
Q So before you got the cage you requested this office?
A Right.

(D.I. 39 at A145)

11

proper because it occurred after the October 26, 2005 critical date for the statute of limitations.

## B. Hostile Work Environment

"The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 429 (1971)) ("*McDonnell Douglas*"). Indeed, "[t]he broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions.  In the implementation of such decisions, it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise." *Id.* at 801.  By contrast, "Title VII does not establish a 'general civility code for the American workplace.'"[4]  *Walker v. Pepsi-Cola Bottling Co.*, 2000 WL 1251906, at *16

---

[4]The anti-discrimination provision of Title VII provides:

It shall be an unlawful employment practice for an employer — (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

(D. Del. Aug. 10, 2000) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

To establish a Title VII claim of discrimination based on a hostile work environment, plaintiff must prove "the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990). Plaintiff must make out a prima facie case by demonstrating that: "(1) he suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive;[5] (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable African American person in that position; and (5) the defendant is liable under a theory of respondeat superior." *Id.* at 1482-83. "A prima facie showing, therefore, contains both a subjective standard (that plaintiff was in fact affected) and an objective standard (that a reasonable, similarly situated African American would be affected)." *Washington v. Autozoners, Inc.*, 452 F. Supp. 2d 546, 553 (D. Del. 2006) (citing *Andrews*, 895 F.2d at 1482-83). Circumstances that aid in determining whether an environment is "hostile" or "abusive" may include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). "The effect on the employee's psychological well being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while

---

[5]The "severe or pervasive" standard has most recently been affirmed by the Supreme Court in *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001).

psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Id.*

Amtrak argues that plaintiff failed to meet his burden on the first element of his prima facie case of hostile work environment because he cannot show any nexus between Amtrak's conduct and plaintiff's race. The court does not agree. Application of Title VII requires a broad interpretation, 29 C.F.R. § 1601.34 ("These rules and regulations shall be liberally construed to effectuate the purpose and provisions of Title VII . . . ."), which creates "a low bar for establishing a prima facie case of employment discrimination." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).

Plaintiff has put forth sufficient evidence so that a reasonable trier of fact could find that the harassment he suffered was based on his race. Although no specific evidence of racism is of record, e.g., name calling, Amtrak's failure to investigate plaintiff's complaints of harassment is the type of subtle discrimination which is considered to be within the scope of Title VII. *McDonnell Douglas*, 411 U.S. at 801. "The employer's responsibility is to provide its employees with nondiscriminatory working conditions. The genesis of inequality matters not; what does matter is how the employer handles the problem." *Dunn v. Wash. Cnty. Hosp.*, 429 F.3d 689, 692 (7th Cir. 2005). Considering the outrageous nature of the incidents of record, including finding fecal matter on his desk and having to re-route his computer to avoid accessing "blackpeoplemeet.com," a genuine issue of material fact exists as to whether Amtrak should have been more aggressive in attempting to remedy the harassment due to the potential that the acts of vandalism were racially motivated. A reasonable jury could

14

find that Amtrak's failure in this regard is prima facie evidence of intentional discrimination.

Further, a reasonable jury could find that plaintiff's allegations of harassment rise to the level of severe or pervasive conduct. *See Brooks v. CBS Radio, Inc.*, 342 Fed. Appx. 771 (3d Cir. 2009) ("Title VII . . . provides relief only to employees who suffer severe or pervasive harassment because of a reason prohibited by Title VII." (citing *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006))). In determining whether the conduct at issue is sufficiently extreme, the totality of the circumstances must be considered. *See Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005). That is, the "overall scenario" must be examined. *Id.* (citation omitted). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions' of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Plaintiff's allegations certainly rise above minor annoyances or simple teasing. The record contains undisputed evidence that fecal matter and a bag of white powder were left on plaintiff's desk, his tools were stolen, and his computer was used to access "blackpeoplemeet.com." The totality of the circumstances, therefore, is serious enough to amount to changes in the terms and conditions of plaintiff's employment; such outrageous conduct is sufficient to create a triable issue on the second prong of plaintiff's hostile work environment claim.

In order for a claim of hostile work environment to be actionable, "[t]he conduct must be both objectively and subjectively abusive, [but] need not lead to a nervous breakdown before Title VII comes into play." *See Harris*, 510 U.S. at 21-22 (1993).

15

Plaintiff contends that the reoccurring acts of vandalism and theft distressed him and made it difficult for him to work, while Amtrak's failure to investigate compounded the problem. Amtrak does not dispute the detrimental affect that plaintiff experienced, nor does it downplay the severity of plaintiff's contentions. Moreover, plaintiff's distress resulting from the harassment was not unreasonable under the circumstances. *See id.* at 21. As to the third and fourth elements of plaintiff's prima facie case, a reasonable jury could find that plaintiff was detrimentally affected by the discrimination he faced, and that a reasonable African American would be detrimentally affected under the same circumstances.

Finally, plaintiff's claims that Amtrak failed, and even refused, to investigate the incidents of vandalism and theft provide a basis to impute liability to Amtrak under a theory of respondeat superior. *See Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007) ("An employer is negligent if it 'knew or should have known about the harassment, but failed to take prompt and adequate remedial action.'" (quoting *Jensen*, 435 F.3d at 453)). The record of evidence demonstrates that plaintiff's supervisors and APD were apprised of each incident and filed reports detailing the matters. (*See, e.g.*, D.I. 39 at A251-76) Although McFadden eventually responded to plaintiff's complaints and was able to remedy the harassment after the final incident on March 9, 2006, a nearly two year span had elapsed where McDowell, Hill, and Poole turned a blind eye to the vandalism and theft. *Cf. Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 26 (3d Cir. 1997) (denying summary judgment when employer knew of harassment but did nothing for three months). The court cannot conclude that Amtrak acted diligently in its

16

investigation or remedy of plaintiff's complaints of harassment. Accordingly, summary judgment is denied on the count of hostile work environment.

## C. Race Discrimination

Generally, to state an employment claim under Title VII, a plaintiff may present either direct evidence of discriminatory intent under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) ("*Price Waterhouse*"), or indirect evidence of discrimination under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ("*McDonnell Douglas*"). Under either framework, the court must weigh the strength of plaintiff's claim against Amtrak's rebuttal defense. With respect to analysis under *McDonnell Douglas*, plaintiff has the opportunity to convince the court that Amtrak's defense is mere pretext. In the end, the court must determine whether sufficient evidence exists to create a genuine issue of material fact as to racial discrimination.

### 1. Burden shifting under *Price Waterhouse*

Discrimination plaintiffs may assert a claim under the framework of *Price Waterhouse* by pointing to direct evidence of racial discrimination in the record. Direct evidence is evidence sufficient to allow the jury to find that "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring). If a plaintiff brings forth direct evidence, then the burden of persuasion shifts to the employer to prove "that it would have treated the plaintiff the same even if it had not considered his race." *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338-39 (3d Cir. 2002). "One form of evidence sufficient to shift the burden of persuasion under *Price Waterhouse* is 'statements of a person

17

involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of in the suit. . . .'" *Id.* at 339 (citing *Hook v. Ernst & Young*, 28 F.3d 366, 374 (3d Cir. 1994). In addition, circumstantial evidence can support a *Price Waterhouse* case if it directly reflects the allegedly unlawful basis for the challenged employment decision. *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (3d Cir. 1997). Plaintiff argues that direct evidence of race-based animus exists in the record, including the denial of the use of office space in favor of Bradigan, and disparate discipline imposed on plaintiff that was not imposed on Pilgrene for the same infraction. As discussed above, plaintiff's allegation that McDowell denied plaintiff office space is not timely and, therefore, the court will only consider plaintiff's disparate discipline claim.

It is undisputed that Hill imposed discipline on plaintiff for sleeping on the job but did not sanction Pilgrene for similar conduct.[6] Plaintiff argues that Hill exhibited racial animus both during the disciplinary meeting and through the circumstances surrounding the discipline. Plaintiff alleges that Hill's racial animus is evident in: (1) his alleged refusal to investigate any of plaintiff's complaints of harassment; (2) his statement that, "[y]ou just won't leave it alone will you" during the disciplinary meeting; and (3) his

---

[6]Plaintiff seeks to discount Hill's testimony from consideration by referring to Hill as an "interested" witness. Plaintiff cites *Hill v. City of Scranton*, 411 F.3d 118 (3d Cir. 2005), for the proposition that the court "should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant." 411 F.3d at 131 n.22. The Third Circuit, however, later clarified its statement, holding that when an interested witness provides plausible, uncontradicted testimony, it is to be considered for the purposes of summary judgment, even if it supports the movant. *Lauren W. ex. rel. Jean W. V. DeFlaminis*, 480 F.3d 259, 271-72 (3d Cir. 2007). Thus, to the extent that Hill's testimony meets these criteria, it is part of the evidence of record.

18

refusal to discipline Pilgrene because he was Caucasian. Even viewing the facts in the light most favorable to plaintiff, a reasonable jury could not find that Hill's decision to discipline plaintiff but not Pilgrene was substantially motivated by plaintiff's race. *See Price Waterhouse*, 490 U.S. at 277. Although there may be an inference that Hill failed to investigate plaintiff's complaints based on racial animus, discussed *infra*, such inference does not rise to the level of substantial negative reliance. *See Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 786 (3d Cir. 2007) ("Only the most blatant [conduct] whose intent could be nothing other than to discriminate constitute[s] direct evidence."). Without probative evidence of unlawful motivation, plaintiff cannot establish a genuine issue of material fact as to direct evidence of racial discrimination. *See id.* (looking for "smoking gun" as direct evidence in *Price Waterhouse* case).

Notwithstanding, Amtrak has provided evidence to rebut plaintiff's arguments regarding direct evidence. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100 (2003). Despite Hill's statement "[y]ou just won't leave it alone will you" following plaintiff's showing Hill a photo of Pilgrene sleeping on the job (D.I. 42 at B33), the circumstances of plaintiff's employment belie any reliance on race in Hill's decision to impose discipline. As Pilgrene's supervisor, plaintiff was not only held to a higher standard than Pilgrene, but he was also charged with disciplining Pilgrene for not performing his responsibilities. (D.I. 39 at A22-23, A66-67, A209-10) Rather than follow through with the formal procedures set in place by Amtrak's policies, plaintiff waited until the end of a meeting in which plaintiff himself was being disciplined for sleeping on the job to present the picture of Pilgrene asleep. Thus, a reasonable

19

factfinder could determine that Hill's decision to impose discipline on plaintiff and not on Pilgrene was not substantially motivated by plaintiff's race.

### 2. Burden shifting under *McDonnell Douglas*

Alternatively, discrimination claims under Title VII are analyzed under the burden-shifting framework set forth by the United States Supreme Court in *McDonnell Douglas*. First, a plaintiff must present a prima facie case of discrimination by showing that (1) he is a member of a protected class, (2) he was qualified for the position he held, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. *See Jones v. School Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999). Once the plaintiff has established a prima facie case of racial discrimination, "the burden shifts to the [employer] 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* at 410 (quoting *McDonnell Douglas*, 411 U.S. at 802). "Finally, should the [employer] carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)). Throughout the court's analysis, "[t]he ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* (citing *Burdine*, 450 U.S. at 253) (first alteration in original).

It is undisputed that plaintiff, as an African American, is a member of a protected class. It is further undisputed that plaintiff is qualified for the foreman position, and that

he experienced at least one adverse employment action. Amtrak challenges that the circumstances surrounding the adverse employment actions give rise to an inference of discrimination. As previously stated, only plaintiff's claims that Amtrak failed to investigate complaints of harassment, and that Amtrak disciplined plaintiff but not Pilgrene are properly before the court. Viewing all the facts and inferences in the light most favorable to plaintiff, plaintiff has produced sufficient evidence to create a genuine issue of material fact as to whether Amtrak intentionally discriminated against plaintiff by failing to investigate his complaints of harassment, but not as to his claim of disparate discipline. *Revis*, 814 F. Supp. at 1215.

### a. Failure to investigate

Plaintiff argues that Amtrak stood by and did nothing while plaintiff's work area was repeatedly vandalized, and that Amtrak's lack of action was predicated on discriminatory animus against plaintiff based on his race. As a consequence of the incidents of vandalism, discussed *supra*, plaintiff contends that it became difficult to complete the tasks of his employment. Defendant does not dispute that the harassment had an adverse effect on plaintiff's employment, but maintains that there was no link between any of the acts alleged by plaintiff and plaintiff's race. Although racial discrimination may not have been openly discussed at the time, overt acts of racism are not necessary to establish an inference of discrimination under Title VII. *See Andrews*, 895 F.2d at 1485. As discussed above, plaintiff has put forth sufficient circumstantial evidence of intentional discrimination to create an issue suitable for trial. Thus, a genuine issue of material fact exists as to whether Amtrak's inaction was based

on race.

### b. Disparate discipline

In order to make out a prima facie case of disparate discipline, plaintiff must show that (a) he is a member of a protected class, (b) his misconduct was comparable in seriousness to that of comparably situated Caucasian employees, or "comparators," and (c) he was disciplined more harshly than were the comparators. *See Dempsey v. Delaware, Dep't of Pub. Safety*, 579 F. Supp. 2d 616, 622 (D. Del. 2008). "Making out a prima facie case is not an onerous burden, but plaintiff must identify evidence in the record sufficient to create an inference of discrimination." *Id.* (citations omitted).

At the close of discovery, plaintiff has failed to identify any Caucasian employees who are similarly situated. *See Mitchell v. Wachovia Corp.*, 556 F. Supp. 2d 336, 347 (D. Del. 2008) ("The central focus of the prima facie case [of racial discrimination] is always whether the employer is treating some people less favorably than others because of their race . . . ." (quoting *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003))). Plaintiff's attempt to establish Pilgrene as a comparator fails as a matter of law because he is a non-supervisory employee held to a lesser standard than plaintiff. (*Id.* at A209-10, A286); *see Houston v. Easton Area Sch. Dist.*, 355 Fed. Appx. 651, 654 (3d Cir. 2009) ("To make a comparison of the plaintiff's treatment to that of an employee outside the plaintiff's protected class for purposes of a Title VII claim, the plaintiff must show that he and the employee are similarly situated in **all relevant** respects.") (emphasis in original). The court cannot ignore the substantial differences in employment expectations between plaintiff and Pilgrene. Notwithstanding, the

22

*McDonnell Douglas* burden shifting process must proceed on plaintiff's allegations of Amtrak's failure to investigate.

### c. Amtrak's legitimate non-discriminatory justification

Because plaintiff has sustained its burden in making out a prima facie case of racial discrimination, the burden of production shifts to Amtrak to clearly set forth, through the introduction of admissible evidence, the reasons for the adverse employment action. "The explanation provided must be legally sufficient to justify a judgment for [Amtrak]. If [Amtrak] carries this burden of production, the presumption raised by the prima facie case is rebutted . . . ." *Burdine*, 450 U.S. at 255. "[Amtrak] need not persuade the court that it was actually motivated by the proffered reasons." *Id.* (citing *Board of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 (1978)).

To meet its burden, Amtrak argues that the harassment occurred because plaintiff was not liked by his subordinates due to his intimidating management style, and not because of his race. As evidence of this, Amtrak submitted complaints filed by plaintiff's subordinates detailing their distaste for plaintiff as a supervisor. (D.I. 39 at A247-48); *see Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1085-86 (3d Cir. 1995) (Title VII does not protect employees from "personality conflicts unrelated to invidious discrimination."). In addition, Amtrak argues that the acts of vandalism and theft were not typical of racially motivated crimes and, moreover, plaintiff never indicated to Amtrak that race was a factor in the incidents of harassment. Such explanations are not legally sufficient to pass the second stage of the *McDonnell Douglas* test. Regardless of alternative possibilities regarding why plaintiff was being

23

harassed, Amtrak, as employer, was charged with a substantial duty to investigate

plaintiff's complaints and instigate remedial action. See Andreoli, 482 F.3d at 644

(requiring supervisor to act quickly and thoroughly once he learns of harassment).

Because Amtrak has not provided a justification for its lack of diligence in putting an

end to the acts of harassment after it was put on notice, summary judgment is denied

on the count of racial discrimination.[7]

### D. Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff must

provide evidence that: "(1) [he] engaged in activity protected by Title VII; (2) the

employer took an adverse employment action against [him]; and (3) there was a causal

connection between [his] participation in the protected activity and the adverse

employment action."[8] Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir.

2006) (citing Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). "An adverse

employment action may be . . . any action that alters an employee's compensation,

terms, conditions, or privileges of employment." Collins v. Sload, 212 Fed. Appx. 136,

140 (3d Cir. 2007). "Retaliation in an employment context is analyzed under the same

---

[7]The court does not need to reach the third stage of the McDonnell Douglas test.

[8]The anti-retaliation section of Title VII provides:

It shall be an unlawful employment practice for an employer to
discriminate against any of his employees . . . because he has opposed
any practice made an unlawful employment practice by this subchapter, or
because he had made a charge, testified, assisted, or participated in any
manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

24

burden-shifting rubric that is used for discrimination claims." *Subh*, 2009 WL 866798, at \*18.  Plaintiff claims that his wife was disciplined for sleeping on the job on August 31, 2006 as an act of retaliation against plaintiff for complaining to the OIG about uneven enforcement of the rules on July 21, 2006.

Title VII requires exhaustion of administrative remedies prior to filing suit in federal court.  *See* 42 U.S.C. § 2000e-5(e)(1); *McDonnell Douglas*, 411 U.S. at 798.  "A Title VII plaintiff in a 'deferral state' such as Delaware must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful conduct." *Lacy v. National R.R. Passenger Corp.*, 254 Fed. Appx. 934, 936 (3d Cir. 2007).  "The relevant test in determining whether [plaintiff] was required to exhaust [his] administrative remedies, [ ] is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984); *see also Tillman*, 538 F. Supp. 2d at 778 ("Courts have allowed claims not specifically mentioned in the EEOC charge where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint.").  Otherwise, the claim is barred.

Plaintiff failed to exhaust his administrative remedies in bringing a claim for retaliation because he did not allege facts in his EEOC complaint that Amtrak imposed discipline on his wife in retaliation for plaintiff's complaint to the OIG.  Moreover, plaintiff did not check the "Retaliation" box on his EEOC complaint, thereby depriving the EEOC of the chance to investigate, mediate, and take remedial action with respect to the claimed discriminatory event.  *See Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394,

398 (3d Cir. 1976). Although the mere formality of checking a box is not determinative of whether or not one exhausted his administrative remedies, it is clear that plaintiff did not provide the EEOC or Amtrak with any indication that he was complaining of retaliation. *See Barzanty v. Verizon PA, Inc.*, 361 Fed. Appx. 411, 414 (3d Cir. 2010).

Even assuming plaintiff did exhaust his administrative remedies, plaintiff did not engage in protected activity under Title VII. "Title VII's opposition clause is triggered by formal EEOC proceedings 'as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support for co-workers who have filed formal charges.'" *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*, 450 F.3d 130 (3d Cir. 2006) (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)) (alteration in original). Although the means of conveyance need not be formal in nature, it still must contain some opposition to an employment practice made unlawful by Title VII. *See Subh*, 2009 WL 866798, at *18. Plaintiff's complaint to the OIG is not protected activity under Title VII because it merely involved allegations of "severely disciplin[ing] the individuals that [management doesn't] like, while turning a blind eye when it comes to those [that management does] like." (D.I. 39 at A287-92) Nowhere did plaintiff contest any unlawful employment practice. For these reasons, summary judgment is granted for Amtrak on this count.[9]

---

[9]Because plaintiff has failed to exhaust his administrative remedies and is unable to allege protected activity, the court declines to address further the sufficiency of plaintiff's prima facie case of retaliation.

26

### E. ADA and Rehabilitation Act

Pursuant to Section 102 of the ADA, "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. The Third Circuit has held that, in order for a plaintiff to establish a prima facie case of discrimination under the ADA, the plaintiff must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d Cir. 1999) (quoting *Gaul v. Lucent Tech.*, 134 F.3d 576, 580 (3d Cir. 1998)). "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Id.* The ADA specifies that an employer discriminates against a qualified individual with a disability when the employer does "not mak[e] reasonable accommodations to the **known** physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." 42 U.S.C. § 12112(b)(5)(A) (emphasis added).

Plaintiff is disabled under the ADA because his COPD substantially limits the major life activity of breathing. Amtrak does not contest that plaintiff has a physical

27

impairment that substantially limits a major life activity, has a record of such an impairment, or is regarded as having such an impairment. 42 U.S.C. § 12102(2). Nor are plaintiff's qualifications for performing his job called into question by Amtrak. Amtrak primarily argues that plaintiff cannot defeat summary judgment on the third element of his ADA claim. The court agrees. The record is clear that plaintiff did not inform Amtrak of his disability or that any medications he was taking would make him drowsy. Further, plaintiff's own deposition testimony shows that his disability had not inhibited his ability to perform his job functions, nor did he request accommodations from Amtrak for the effects of his COPD. Summary judgment, therefore, is granted for Amtrak on plaintiff's disability claims.

## V. CONCLUSION

For the reasons stated above, defendant's motion for summary judgment (D.I. 37) is granted in part (as to plaintiff's claims of disparate discipline, retaliation, and disability discrimination) and denied in part (with regard to plaintiff's claims of failure to investigate and hostile work environment). An appropriate order shall issue.